# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| CFO MANAGEMENT HOLDINGS, LLC,[1] | § § | CASE NO. 19-40426 |
| | § | Jointly Administered |
| DEBTORS | § | |

### DEBTORS' REPLY TO UNITED STATES TRUSTEE'S OBJECTION TO DEBTORS' MOTION TO EMPLOY AND RETAIN SIERRA CONSTELLATION PARTNERS, LLC, AND TO DESIGNATE LAWRENCE PERKINS AS CHIEF RESTRUCTURING OFFICER (DOCKET #11)

TO THE HONORABLE BRENDA T. RHOADES,
UNITED STATES BANKRUPTCY JUDGE:

CFO Management Holdings, LLC, Carter Family Office, LLC, Christian Custom Homes, LLC, Double Droptine Ranch, LLC, Frisco Wade Crossing Development Partners, LLC, Kingswood Development Partners, LLC, McKinney Executive Suites at Crescent Parc Development Partners, LLC, North-Forty Development LLC, and West Main Station Development, LLC, debtors and debtors-in-possession (collectively, the "Debtors"), in the above-captioned, jointly administered bankruptcy cases (the "Chapter 11 Cases"), file *Debtors' Reply to United States Trustee's Objection to Debtors' Motion to Employ and Retain Sierra*

---

[1] Carter Family Office, LLC, 5899 Preston Road, Ste. 203, Frisco, TX 75034, EIN# XX-XXX1652 Case No. 19-40432; CFO Management Holdings, LLC, 5899 Preston Road, Ste. 203, Frisco, TX 75034, EIN# XX-XXX6987, Case No. 19-40426; Christian Custom Homes, LLC, 5899 Preston Road, Ste. 203, Frisco, TX 75034, EIN# XX-XXX4648, Case No. 19-40431; Double Droptine Ranch, LLC, 5899 Preston Road, Ste. 203, Frisco, TX 75034, EIN# XX-XXX7134, Case No. 19-40429; Frisco Wade Crossing Development Partners, LLC, 5899 Preston Road, Ste. 203, Frisco, TX 75034, EIN# XX-XXX4000, Case No. 19-40427; Kingswood Development Partners, LLC, 5899 Preston Road, Ste. 203, Frisco, TX 75034, EIN# XX-XXX1929, Case No. 19-40434; McKinney Executive Suites at Crescent Parc Development Partners, LLC, 5899 Preston Road, Ste. 203, Frisco, TX 75034, EIN# XX XXX2042, Case No. 19-40428; North-Forty Development LLC, 5899 Preston Road, Ste. 203, Frisco, TX 75034, EIN# XX-XXX5532, Case No. 19-40430; and West Main Station Development, LLC, 5899 Preston Road, Ste. 203, Frisco, TX 75034, EIN# XX-XXX7210, Case No. 19-40433.

*Constellation Partners, LLC, and to Designate Lawrence Perkins as Chief Restructuring Officer (Docket #11)* (this "<u>Reply</u>"), and in support hereof, respectfully states the following:

## Introduction[2]

1. Sierra and Mr. Perkins have a singular goal in these Chapter 11 Cases—to maximize recovery for creditors and the investors defrauded by Carter's real-estate investment scheme. With their efforts to date, Sierra and Mr. Perkins have significantly increased the potential recovery for the estates, while avoiding the irreparable harm that would have befallen the estates without such efforts.

2. In the face of the unique challenges in these Chapter 11 Cases, since being retained, Sierra and Mr. Perkins have made enormous progress in preserving the assets of the estates and maximizing value for all stakeholders. Indeed, based on the efforts and plan of Sierra, Mr. Perkins, and Winstead, the Debtors have the opportunity to recovery as much as 70% for creditors, as opposed to an estimated 20% recovery or lower through a "fire sale" liquidation.

3. Contrary to UST's contentions, Sierra and Mr. Perkins submit that they: (i) are following the Jay Alix Protocol, (ii) are not disclaiming fiduciary duties, (iii) are not engaging in (and have not engaged in) self-dealing, and (iv) are completely independent and outside the influence of Carter. Further, based on the collective experience and knowledge of Sierra, Mr. Perkins, and Debtors' counsel, Sierra and Mr. Perkins submit that the retention of Perkins as CRO is less financially burdensome to the estates than installing a chapter 11 trustee. Notwithstanding this, consistent with the Jay Alix Protocol, Sierra requests approval to submit monthly staffing reports (with a 14-day objection period), for payments on a monthly basis, but with its fees subject to the reasonableness standard under section 330 of the Bankruptcy Code.

---

[2] Any capitalized term not otherwise defined in this Introduction shall have the meaning ascribed to such term later in this Reply.

**DEBTORS' REPLY TO UNITED STATES TRUSTEE'S OBJECTION TO DEBTORS' MOTION TO EMPLOY AND RETAIN SIERRA CONSTELLATION PARTNERS, LLC, AND TO DESIGNATE LAWRENCE PERKINS AS CHIEF RESTRUCTURING OFFICER (DOCKET #11)** **PAGE 2 OF 16**

Sierra and Perkins submit that this (as well as the UST's alternative request for relief) can easily be achieved under section 363(b) of the Bankruptcy Code and the Jay Alix Protocol.

4. Notably, the UST also filed his Objection before the Debtors' timely filed their schedules and statements of financial affairs, and before the 341 Meeting, where the UST, the Committee, Columbia, or any other creditors would have the opportunity to question the Debtors about any concerns related to their financial affairs, including the Bridge Loan (which the Debtors specifically disclosed at the first-day hearings on February 27) or any other of Perkins's actions in managing the Debtors.

5. Based on the circumstances of these Chapter 11 Cases, the Debtors submit that the retention of Sierra and Perkins pursuant to sections 105 and 363(b) of the Bankruptcy Code is in the best interests of Debtors, their estates, and their creditors.

## Relevant Procedural and Factual Background

6. On February 17, 2019 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), commencing the Chapter 11 Cases. The Debtors continue to manage and operate their business as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

7. On March 4, 2019, the United States Trustee (the "UST") appointed the Official Unsecured Creditors' Committee (the "Committee") in the Chapter 11 Cases, pursuant to 11 U.S.C. § 1102(a)(1). Docket No. 58.

8. On March 5, 2019, not even three weeks after the Petition Date, Columbia filed its *Motion of CPIF Lending, LLC for Appointment of a Chapter 11 Trustee* [Docket No. 59] (the "Trustee Motion").

9. The next day, on March 6, 2019, the UST filed the *Unites States Trustee's Objection to Debtors' Motion to Employ and Retain Sierra Constellation Partners, LLC, and to Designate Lawrence Perkins as Chief Restructuring Officer (Docket #11)* [Docket No. 65] (the "Objection").

10. Then, on March 6, 2019, the UST also filed a limited objection to Winstead's retention as bankruptcy counsel to the Debtors. *See* Docket No. 66.

11. On March 17, 2019, the Debtors timely filed their schedules and statements of financial affairs. *See* Docket No. 88. The first meeting of creditors (the "341 Meeting") was held the next day, March 18, 2019, and was continued to April 19, 2019.

12. Also on March 18, 2019, at Sierra's request, Sierra and Debtors' counsel met with the Committee and its counsel and gave a detailed presentation on the numerous challenges presented in these Chapter 11 Cases, the progress made by Sierra, Perkins, and Debtors' counsel to date, as well as an analysis of the assets and liabilities and a plan to maximize value for all constituents.

13. On March 28, 2019, the Debtors filed *Debtors' Objection to Motion of CPIF Lending, LLC for Appointment of Chapter 11 Trustee* [Docket No. 118] (the "Trustee Objection").

14. **The Debtors hereby incorporate by reference the Trustee Objection, in full and for all purposes, including the factual background and arguments set for therein.**[3] **The Debtors also attach hereto the Bridge Loan and Deed of Trust as Exhibit A, and the "Sources & Uses" of the Bridge Loan as Exhibit B, which are correspondingly attached as exhibits to the Trustee Objection.**

---

[3] Any capitalized term not otherwise defined herein shall have the meaning ascribed to such term in the Trustee Objection.

**Reply**

A. **The Retention of Sierra and Perkins is Proper Pursuant to Section 363(b) and is Based on the Jay Alix Protocol.**

15. Under applicable case law in this and other jurisdictions, if a debtor's proposed use of its assets pursuant to section 363(b) of the Bankruptcy Code represents a reasonable exercise of the debtor's business judgment, such use should be approved. *See United Retired Pilots Benefit Prot. Ass'n v. United Airlines, Inc. (In re UAL Corp.)*, 443 F.3d 565, 571 (7th Cir. 2006); *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991); *see also In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (noting that courts have applied the "sound business purpose" test to evaluate motions brought pursuant to section 363(b) of the Bankruptcy Code); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application.").

16. Moreover, as set forth in the Application, retention of a chief restructuring officer ("CRO") in a chapter 11 case, pursuant to sections 105 and 363, is common, even in the Fifth Circuit. *See, e.g., In re Juniper GTL, LLC*, Case No. 16-31959 (MI) (Bankr. S.D. Tex. May 24, 2016) [Docket No. 176] (authorizing retention of a CRO pursuant to section 363, and allowing the debtors to pay, in the ordinary course of business, fees and expenses incurred in connection with the CRO's retention); *In re HII Technologies, Inc.,* Case No. 15-60070 (DRJ) (Bankr. S.D. Tex. Sept. 22, 2015) [Docket No. 32] (same); *see also In re First River Energy, LLC,* Case No. 18-50085 (Bankr. W.D. Tex. Feb. 13, 2018) [Docket No. 200] (authorizing retention of a CRO pursuant to section 363 and treating incurred fees and expenses as an administrative expense following reports of compensation and expiration of objection period); *In re Forest Park*

*Medical Ctr. at Frisco, LLC*, Case No. 15-41684 (Bankr. E.D. Tex.) (approving CRO retention pursuant to section 363(b)); *In re El Paso Children's Hospital Corp.*, Case No. 15-30784 (Bankr. W.D. Tex.) (same)

17. Since 2001, due to the unique characteristics of a CRO retained in the context of a chapter 11 case, the UST program itself has taken the position that a CRO is best retained pursuant to section 363(b), rather than section 327 of the Bankruptcy Code—as long as the CRO meets certain ethical and disclosure protocols (the "Jay Alix Protocol"). *See* CLIFFORD J. WHITE III, WILLIAM K. HARRINGTON, AND NAN ROBERTS EITEL, THE FUTURE OF THE USTP'S CRO "PROTOCOL" (2018), https://www.justice.gov/ust/file/abi_201809.pdf/download [hereinafter the "USTP Report"]. In the USTP Report, the authors note:

> Even though a few courts have criticized the protocol as too accommodating to the CRO industry, most courts and the CRO firms have widely accepted and followed the protocol. The USTP therefore intends to continue to follow the protocol and to enforce it consistently. Likewise, if proposed CROs deviate from the protocol, the USTP will continue to object to their employment applications under § 327.

USTP Report at p. 3.

18. In summary, the Jay Alix Protocol (which Mr. Perkins believes he has followed) provides that the proposed professional:

    a. is prohibited from serving, or having served within two years, on a debtor's board. The USTP Report explains: "A board must be independent of the CRO to prevent actual or apparent conflicts of interest . . . . For example, if the CRO serves on the board while that same board decides to retain the CRO's firm, this insider transaction presents a conflict of interest";

    b. cannot have an actual conflict of interest. Thus, the professional may only serve in one capacity (i.e., as a CRO, crisis manager, financial adviser, claims agent, or investor);

    c. must disclose all connections with parties in interest and professionals, analogous to the disclosure requirements under Fed. R. Bankr. P. 2014; and

    d. must disclose staffing and compensation, with such compensation subject to court review under a "reasonableness" standard.

*Id*; *see In re Nine W. Holdings*, 588 B.R. 678, 688 (Bankr. S.D.N.Y. 2018).

19. Recently, however, in *Nine West*, the Bankruptcy Court for the Southern District of New York overruled the UST's objection under section 327, and, while not disapproving of the Jay Alix Protocol (and recognizing its pragmatic advantage), the court ruled that "nothing precludes the Debtors from relying on section 363(b) to seek authorization for the retention of [the restructuring firm and CEO]." *Nine W. Holdings*, 588 B.R. at 691. The court noted that the Jay Alix Protocol "is not a provision of the Bankruptcy Code[,] is not the law, and it is not binding on this Court or any other court." *Id*. at 687-88. The court also recounted the policy behind the protocol, quoting the acting general counsel for the Executive Office for the U.S. Trustee, from November 13, 2001:

> We have seen any number of situations where turnaround or other advisory services seek to be retained as professionals under Section 327 and also have a role in management . . . . In our view, that renders them an insider and, therefore, not disinterested. This protocol makes clear how advisory firms will work with the debtor in the future, at least in a way that's acceptable to the UST. We have some cases pending against certain firms at this point - there are some agreements pending that we're trying to bring in under the protocol. The protocol right now only applies to cases in Region 3. But we anticipate making it a policy nationwide after discussion with the USTs.

*Id*. at 688. The *Nine West* opinion is attached hereto as **Exhibit C**.

20. Also recently, in the *Abuejo* case, in approving the application to retain a CRO pursuant to section 363(b), the Bankruptcy Court for the District of Colorado commented and held:

> The role of a CRO is often critical to success in bankruptcy. The CRO is responsible for leading the company through the bankruptcy process with the help of debtor's counsel. The reason the CRO issue continually arises in chapter 11 cases is because the role of CRO is critical and necessary in many chapter 11 cases where previous management has been released or has deserted.

> . . . .
>
> . . . The benefits of using 11 U.S.C. § 363(b) are that the CRO does not have to be disinterested, the CRO is not required to file fee applications for review under 11 U.S.C. § 330 and the CRO can be covered by the existing directors' and officers' liability insurance or otherwise be indemnified.
>
> . . . .
>
> The UST urges this Court to strictly enforce the Code. The Court believes it is enforcing the Code and recognizes that chapter 11 is a flexible statute. Under the unique and compelling circumstances of this case, the outstanding job performed by [the CRO] thus far, and the satisfaction of the twin goals of impartiality and court review of fees, the [CRO application] is granted *nunc pro tunc* to the petition date.

*In re Ajubeo LLC*, No. 17-17924-JGR, 2017 Bankr. LEXIS 4014, at *7-13 (Bankr. D. Colo. Sept. 27, 2017). The *Ajubeo* opinion is attached hereto as **Exhibit D**.

21.    Here, the Application specifies that, among other things: (i) Perkins is serving as the CRO for the Debtors, while Sierra and its affiliates shall not act as a financial advisor, claims agent or investor in the connection with the Cases, (ii) the Perkins Declaration discloses the firm's relationships with parties in interest, (iii) Sierra shall file Monthly Staffing Reports, and (iv) Perkins is not (and has not been) a director of the Debtors. Accordingly, Sierra and Perkins's retention is following the Jay Alix Protocol. *See* Application ¶¶ 31-36.

22.    Additionally, although the UST questions in his Objection whether Sierra received a "New Capital Fee," in the Application, Perkins specifically discloses: "Notwithstanding provisions of the Engagement Letter, Sierra will not be paid any Transaction Fee or New Capital Fee, as defined by and described by the Engagement Letter and Sierra shall not seek any success fee absent application to and an order of this Court." Application ¶ 29. Thus, the UST's averments here are inapposite.

23. As further benefit to the estates, it important to note that Sierra has reduced its hourly rates by more than 10% (to be more competitive than other firms approved as CROs in this region), and D&O insurance was also obtained for Mr. Perkins.

24. Finally, consistent with the Engagement Letter (and the Jay Alix Protocol), Sierra has requested approval to submit monthly staffing reports (with a 14-day objection period), for payments on a monthly basis, but with its fees subject to the reasonableness standard under section 330 of the Bankruptcy Code. Sierra and Perkins submit that this (as well as the UST's alternative request for relief) can easily be achieved under section 363(b) of the Bankruptcy Code and the Jay Alix Protocol.

**B.    Payment of Professional Fees is Not Legally Recognized, Actionable Self-Dealing.**

25. Only a week after the First Day Hearing, prior to the 341 Meeting, prior to the filing of schedules and statements of affairs, and just after the appointment of the Committee, the UST filed its Objection, prematurely questioning the propriety of the corporate restructuring. Importantly, contrary to any suggestion otherwise, Perkins did not authorize his own retention as CRO while acting as the Debtors' current management. Rather, pursuant to Carter's Written Consent as well as the Company Agreement (both defined and discussed below), Carter—as sole member of each of the Subsidiary Debtors and CFO—consented to and authorized the retention of Sierra and Perkins in order to achieve the restructuring objectives advised on by Sierra and Debtors' counsel.

26. The UST also suggests that by obtaining the Bridge Loan, which was needed to pay for critical expenses of the Debtors, including for the substantial work performed by Sierra (at discounted rates), Sierra engaged in self-dealing. This argument is nonsensical—paying

Sierra's contracted-for fees is neither self-dealing nor the creation of an adverse interest against the estates.

27. "Self-dealing" is defined as: "Participation in a transaction that benefits oneself instead of another who is owed a fiduciary duty. For example, a corporate director might engage in self-dealing by participating in a competing business to the corporation's detriment." BLACK'S LAW DICTIONARY (9th ed. 2009).

28. In the bankruptcy context, self-dealing transactions have included: when fiduciaries fail to disclose involvement on the seller's side and buyer's side of the transaction, *see Light v. Whittington (In re Whittington)*, 530 B.R. 360, 380 (Bankr. W.D. Tex. 2014) (citing *Manheim Auto. Fin. Servs., Inc. v. Hurst (In re Hurst)*, 337 B.R. 125, 131-32 (Bankr. N.D. Tex. 2005)); when a trustee, who is a fiduciary, employs his own law firm and is unable to show the fundamental fairness of the transaction and that the retention of his law firm is in the best interests of the estate, *In re 320Auto.Com, LLC*, 2013 WL 4806427, 2013 Bankr. LEXIS 3778, at *4-6 (Bankr. S.D. Tex. Sept. 6, 2013); or when, in the context of defalcation, a trustee uses trust funds to make loans to himself or family members, *see Fid. Nat'l Title Ins. Co. v. Colson (In re Colson)*, 2013 WL 5352638, 2013 Bankr. LEXIS 4001, at *84 (Bankr. S.D. Miss. Sept. 23, 2013) (citing *BankChampaign v. Bullock (In re Bullock)*, 2010 Bankr. LEXIS 1783, 2010 WL 2202826 (Bankr. N.D. Ala. May 27, 2010).

29. The circumstances here do not demonstrate self-dealing.

30. Further, contrary to the UST's contention that Mr. Perkins has disclaimed his fiduciary duties, as management for the Debtors, by operation of law, Sierra and Mr. Perkins

have a fiduciary duty to act in the best interest of creditors and other stakeholders.[4] And as has been demonstrated throughout the short life of these Chapter 11 Cases, Sierra and Mr. Perkins are fully cognizant of their duties and have acted in accordance with such duties and are demonstrably motivated to maximize value and show no actual engagement in or propensity to engage in wrongdoing or malfeasance in the exercise of their duties. Courts have also recognized the need for bridge loans in distressed situations, prior to filing chapter 11:

> as a protective advance to maintain the Debtors' business operations while the Debtors considered and pursued various options for restructuring their businesses either by filing a Chapter 11 petition, through a sale outside of bankruptcy, or otherwise. **Without the Bridge Loan, the Debtors would not have had sufficient available sources of working capital and financing to carry on the operation of their businesses or seek to restructure their businesses**.

*In re Coda Holdings, Inc.*, 2013 WL 6840242, 2013 Bankr. LEXIS 5476, *12-13 (Bankr. D. Del. May 3, 2013); *see also In re Neogenix Oncology, Inc.*, 2015 WL 5786345, 2015 Bankr. LEXIS 3343, *4-5 (Bankr. D. Del. Sept. 30, 2015).

31. Here, payment of Bridge Loan funds to Sierra *for contracted work performed by Sierra* was not to the detriment of the Debtors, but rather was to the Debtors' benefit. It is hardly self-dealing when the parties compensated did substantial work for the Debtors, such compensation and work are disclosed (to the Court, creditors, and parties in interest), and the work was necessary to preserve the Debtors' business and maximize value for the estates.

32. Further, as described above, Sierra *did* disclose the Bridge Loan to the Court and creditors (both before and after the filing of UST's Objection). Debtors' counsel specifically disclosed the Bridge Loan and its purposes at the First Day Hearings on February 27. The

---

[4] The UST's own policy is clear: "Upon the filing of a bankruptcy petition, by operation of law, management transforms into a fiduciary that is bound to act for the benefit all stakeholders, including creditors." Clifford J. White III, Director, Executive Office for United States Trustees, *United States Trustee Program's Agenda on Chapter 11 Corporate Reorganization Issues* (article adapted from a presentation prepared by Mr. White for the 33rd Annual Bankruptcy and Restructuring Conference of the Association of Insolvency and Restructuring Advisors held in Dallas, Texas, on June 7-10, 2017).

Debtors then disclosed the Bridge Loan in the Debtors' timely filed statements of financial affairs, as well as at the 341 Meeting (and a subsequent meeting with the Committee and its counsel). Moreover, from the outset, Sierra and Perkins kept regulators apprised of their intent in seeking bridge financing for the Debtors and their plan to use the Bridge Loan to maintain the value of the Debtors' assets and ultimately fund the filing of these Chapter 11 Cases, which Sierra and Debtors' counsel believe will lead to maximum recovery for creditors.

**C.    Sierra and Perkins Are Not Beholden to Carter.**

33.    Sierra's management of the Debtors is completely independent from Carter, and Carter exercises absolutely no influence over Sierra or Perkins.

34.    First, on January 16, 2019, pursuant to the *Action by Written Consent of the Sole Members of the Companies Listed on Schedules I* (the "Written Consent"), Carter transferred all authority and control over the Subsidiary Debtors to Perkins, directly or through CFO, as "a disinterested and independent manager of each of the [Subsidiary Debtors]." The Written Consent also provided that, among other things, Carter:

> . . . determined it to be in the best interests of [each Subsidiary Debtor], their creditors, members and other stakeholders to remove [his] authority to manage the affairs of [each Subsidiary Debtor] and to appoint [CFO] as the manager of each [Subsidiary Debtor];
>
> [and he] desires to amend the LLC Agreement of [each Subsidiary Debtor] to provide that, among other things, the business and affairs of [each Subsidiary Debtor] shall be managed by or under the direction of [CFO] who shall have the full, exclusive and complete power and authority to manager and control the business and affairs of [each Subsidiary Debtor] and shall have the power and authority to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes of [each Subsidiary Debtor] without the consent or approval of [Carter] including the power to sell or dispose of, encumber, or transfer any assets of [any Subsidiary Debtor] and/or to file a petition for relief under the United States Code, and except as otherwise required by law, [Carter] shall not have any power or authority to manage or control the business and affairs of [any Subsidiary Debtor.]

35. Then, pursuant to the *Company Agreement of CFO Management Holdings, LCC* (the "Company Agreement") adopted by Carter on January 18, 2019:

> The business affairs of [CFO] will be managed by [Perkins]. Except as expressly provided herein or as otherwise required by applicable law, [Perkins] will have complete and exclusive control of the management of [CFO]'s business and affairs, and . . . [Carter] shall have no power or authority to manage the business and affairs of [CFO] and shall have no voting or consent rights, except as set forth in the TBOC.

36. Accordingly, although Carter is the sole member of CFO, Carter has no authority over Sierra, Perkins, or any of the Debtors.

37. The UST also references Columbia's argument that under Texas Business Organizations Code ("TBOC"), Carter would always retain the power to remove Perkins and terminate Sierra.

38. As described above, Perkins is the Manager of CFO, pursuant to the Company Agreement. And CFO is the manager for each of the Subsidiary Debtors, pursuant to the Written Consent as well as the certificate of amendment and company agreement for each entity.

39. Section 101.054(a) discusses portions of the TBOC that may not be amended by the company agreement of an LLC, and is inapplicable to the removal of an LLC manager. It is Section 101.304 of the TBOC that provides for the removal of LLC managers.

40. As set forth more fully in the Trustee Objection, the Debtors believe that Carter's action to unilaterally oust Mr. Perkins as manager of CFO, without court approval, impacts the estates and is prohibited by the automatic stay. Further, the Debtors believe Carter's action is in violation of the Freeze Order entered by the district court, which prohibits Carter or any of his agents "from, *directly or indirectly* . . . effecting any disposition of any asset." Accordingly, the "Action of Written Consent" to remove Mr. Perkins as manager of CFO should be deemed void or voided.

41. Ironically, while on the one hand, the UST objects to Sierra and Perkins's retention to the extent Carter exerts any influence over them (which he does not) due to the fraud committed by Carter, on the other hand, even if not beholden to Carter, the UST objects because Perkins is completely independent. The Trustee appears to want it both ways. By this logic, these Debtors cannot retain an independent CRO—thus, apparently, to stay in bankruptcy, either a chapter 11 trustee should be appointed or Chapter 11 Cases should be converted to chapter 7. Either result would have a significant detrimental effect on all constituents, including the defrauded noteholders.

D. **Retaining Sierra and Perkins Maximizes Value for the Estates, and the Removal of Perkins Would Be Financially Detrimental to the Estates.**

42. Perkins and Sierra's efforts thus far in these Chapter 11 Cases have significantly increased the potential for a substantial recovery for creditors. Considering the time and expense that a chapter 11 trustee or other replacement would incur in becoming familiar with the unique factual, legal, and business issues of these cases, as well as the duplicative efforts in such process, removing Perkins would result in a considerable financial burden on the estates. In addition to the learning curve of these cases, any replacement (or chapter 11 trustee) would likely select new counsel and need to retain a financial advisor (who would also face a challenging and expensive learning curve). The removal of Perkins and the installation of a replacement (or the appointment of a trustee) would likely also negatively impact the progress made by Sierra and Perkins in obtaining DIP financing, which Perkins and Debtors' counsel view as an integral component in maximizing value of the estates' assets. Based on the unique facts and circumstances of these Chapter 11 Cases, the retention of Perkins as CRO is in the eminent sound business judgment of the Debtors and is in the best interests of the estates and their

creditors. Accordingly, the Debtors submit that the UST's Objection should be overruled and the Application should be approved.

### Reservation of Rights

43. The Debtors also reserve the right to amend, supplement, or withdraw this Objection at any time prior to any hearing to consider the Motion and to assert further arguments as the evidence may allow.

### Prayer

The Debtors respectfully requests that this Court (i) approve the Application; (ii) overrule the UST's Objection, and (ii) grant the Debtors such other and further relief as is appropriate and just under the circumstances.

**Dated: March 28, 2019.**

        Respectfully submitted,

By: */s/ Joseph J. Wielebinski*
Joseph J. Wielebinski
State Bar No. 21432400
Annmarie Chiarello
State Bar No. 24097496
Jason A. Enright
State Bar No. 24087475
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
(214) 745-5400 (Phone)
(214) 745-5390 (Facsimile)
jwielebinski@winstead.com
achiarello@winstead.com
jenright@winstead.com

**PROPOSED COUNSEL FOR THE DEBTORS AND DEBTORS-IN-POSSESSION**

### Certificate of Service

The undersigned hereby certifies that on March 28, 2019, the foregoing document will be served by KCC, the Debtors' proposed noticing agent, via first class U.S. Mail to the parties listed on the attached service list, which includes all creditors and parties-in-interest in the Chapter 11 Cases. Additionally, notice of this document was electronically mailed on March 28, 2019, to the parties registered or otherwise entitled to receive electronic notices in this case pursuant to the Electronic Filing Procedures in this District.

*/s/ Jason Enright*
One of Counsel