1                 IN THE UNITED STATES BANKRUPTCY COURT
                  FOR THE EASTERN DISTRICT OF TEXAS
2                         SHERMAN DIVISION

3

4    IN RE:                    )   BK. NO:  19-40426-BTR

5                              )

6    CFO MANAGEMENT HOLDINGS, )

7    LLC                       )

8        D E B T O R.          )

9

10

11             *   *   *   *   *   *   *   *   *   *

12                  TRANSCRIPT OF PROCEEDINGS

13             *   *   *   *   *   *   *   *   *   *

14

15

16

17

18

19

20        BE IT REMEMBERED, that on the 14th day of July, 2020,

21   before the HONORABLE BRENDA T. RHOADES, United States

22   Bankruptcy Judge at Plano, Texas, the above styled and

23   numbered cause came on for hearing, and the following

24   constitutes the transcript of such proceedings as hereinafter

25   set forth:

1                    P R O C E E D I N G S

2                    COURTROOM DEPUTY:  The next matter on the

3    docket is CFO Management Holdings.  Case 19-40426.  Hearing

4    on disclosure statement.  Hearing on a motion to convert

5    Chapter 11 to Chapter 7.  And a motion for an entry and order

6    approving the disclosure statement and considering

7    confirmation.

8                    THE COURT:  Appearances.

9                    MR. NYLEN:  Good afternoon, Your Honor.  Sven

10   Nylen on behalf of CPIF Lending, LLC.

11                   MR. MOORE:  Good afternoon, Your Honor.  This

12   is Seth Moore on behalf of ENJ Corp.

13                   MR. LEVICK:  Your Honor, this is Larry Levick

14   on behalf of the Unsecured Creditors Committee.

15                   MR. MILLER:  Your Honor, this is David Miller

16   on behalf of the investor class in a related adversary

17   proceeding.

18                   THE COURT:  Okay.  Do we have an appearance by

19   or on behalf of the Trustee or the debtor?

20                   MR. GULBE:  Your Honor, this is Matt Gulbe

21   from the SEC.  I'm also on the call.  Not sure if you're

22   going to hear from me or not.

23                   THE COURT:  I'm sorry, I didn't hear your

24   name.  Could you restate your name, please?

25                   MR. GULBE:  Yes, Your Honor.  It's Matt Gulbe,

1   G-u-l-b-e, representing the United States Securities &

2   Exchange Commission.

3                THE COURT:  Okay.  Thank you.

4          Is there any appearance by or on behalf of David

5   Wallace or CFO Management Holdings, LLC?

6                MS. ROSS:  Yes, Your Honor.  This is Judith

7   Ross and Jessica Lewis on behalf of the Trustee in the case.

8   We somehow got disconnected, so we apologize for being slow

9   and not making the appearance.

10               THE COURT:  Okay.

11               MR. WALLACE:  Sorry, Your Honor, David

12   Wallace.  I was going to speak up and say, apparently it's

13   just me by myself, but counsel is here thankfully.

14               THE COURT:  Okay.

15               MR. WALLACE:  I'm also on.

16               THE COURT:  Okay.  Thank you.

17               MR. LEVICK:  And, Your Honor.

18               THE COURT:  Yes.

19               MR. LEVICK:  This is Larry Levick.  I have, I

20   think I may have all of my Committee members on the line, as

21   well.

22               THE COURT:  Okay.

23               MR. LEVICK:  For listening in only.

24               THE COURT:  All right.  So where are we?

25               MS. ROSS:  Your Honor, if I might suggest an

1   approach here.  We don't have agreement on the motion to

2   convert.  But we want to try to get through this hearing as

3   quickly as possible.  So here would be my suggestion.  My

4   suggestion would be that Ms. Lewis, who knows the most about

5   the disclosure statement, present any objections to the

6   disclosure statement and present that to the Court, along

7   with the motion for solicitation.  Then I would suggest that

8   CPIF be permitted to make their arguments about the motion to

9   convert.  And then any other party that wants to have a --

10  state anything.  And then I can respond to the motion to

11  convert.  And then at that point, CPIF could make a reply, if

12  they wanted to do that.  That would be my suggestion.

13       I would further suggest that we get the exhibits into

14  the record first, so that really we just only need one set of

15  arguments.

16              THE COURT:  Okay.  Any different opinion about

17  that from anyone?

18              MR. NYLEN:  Your Honor, good afternoon.  This

19  is Sven Nylen on CPIF, on behalf of CPIF.

20       I don't have a problem with that.  I will note that

21  our -- there are two matters up today, but they are fairly

22  related on some levels here.  I would have no problem if -- I

23  think we're going to focus, primarily, on the legal issue of

24  whether the disclosure statement should be denied on the

25  basis of a patently unconfirmable plan.  We're not going to

1  be focusing as much of our time on the motion to convert.

2  But I think it's fine for the Trustee to go first on the

3  disclosure statement and we will then present our objections

4  at the end of that presentation.  So I don't know if maybe

5  another way of approaching this is the Trustee puts on their

6  disclosure statement case, we make our objections, and sort

7  of lead that into the motion to convert, which will not be a

8  long presentation.  The Trustee could proceed to reply to

9  both our objections and the motion to convert.

10          MS. ROSS:  Your Honor, I think I'm fine with

11  what is -- I think he's essentially agreed to kind of what I

12  proposed in the first instance.

13          THE COURT:  Okay.  Let's let Ms. Lewis start

14  on the motion to approve the disclosure statement and then

15  we'll go from there.  Okay.

16          MS. LEWIS:  Thank you, Your Honor.  Jessica

17  Lewis here on behalf of David Wallace, Chapter 11 Trustee for

18  CFO Management Holdings.  As we just discussed, we're going

19  to start today on the approval of the disclosure statement,

20  as well as the related solicitation procedures.  But the

21  disclosure statement itself is a -- actually, as Ms. Ross

22  mentioned, it might make sense to go ahead and look at the

23  exhibits.

24          In this case, Your Honor should have an exhibit

25  notebook from the Trustee including the disclosure statement

CINDY SUMNER, CSR (214) 802-7196

1    under Tab 1.  The second exhibit, Tab 2, the second amended

2    plan, which is also Exhibit A of the disclosure statement.

3    Trustee Number 3, Exhibit Trustee Number 3 is the liquidation

4    analysis, which is also Exhibit B to the disclosure

5    statement.  Exhibit Trustee 4 is the form of the investor

6    claims schedule, which is Exhibit C to the disclosure

7    statement.  Trustee 5 is the complaint, in addition to claims

8    that the Trustee filed with respect CPIF Lending, LLC.  And

9    Trustee 6 is a declaration of David Wallace, which is filed

10   in support of the disclosure statement and the various

11   filings that the Trustee has made, both with respect to the

12   disclosure statement and the motion to convert.  So those are

13   the exhibits that I'll be referring to.  And we'll be asking

14   that the Court admits those.  I'd be glad to ask for that

15   now, if that is okay with the Court.

16            THE COURT:  Okay.  So you're offering

17   Trustee's 1 through 6?

18            MS. LEWIS:  Yes, Your Honor.

19            THE COURT:  Any objections?

20            MR. NYLEN:  Good afternoon, Your Honor.  Sven

21   Nylen on behalf of CPIF Lending.

22      My only objection would be to Trustee Exhibit 6, the

23   declaration of the Trustee, Mr. Wallace, to the extent it is

24   making any legal conclusions that are appropriately questions

25   for the Court.  And, specially, as to whether the plan is

1  confirmable.  That is my only objection.  Obviously the

2  disclosure statement speaks for itself.  We do not intend to

3  cross-examine Mr. Wallace, but we object to any legal

4  conclusions set forth in the declaration.

5           THE COURT:  All right.  Then Trustee's

6  Exhibits 1 through 6 are admitted.  With respect to the

7  allegations in the declaration, I think the Court knows the

8  difference between legal conclusions and factual assertions.

9  And to the extent they're legal conclusions, the Court will

10  ignore them and make its own legal conclusion.  Okay?

11           MR. NYLEN:  Thank you, Your Honor.

12           THE COURT:  Thank you.

13      All right.  Are there any other exhibits that need to

14  be admitted for purposes of the disclosure statement hearing?

15           MR. NYLEN:  Your Honor, Sven Nylen, again, for

16  CPIF.  We have an exhibit list at docket 491.  But, frankly,

17  Your Honor, we are only making legal arguments today.  Most

18  of our exhibits are just different filings on the docket.  I,

19  frankly, don't think I need to have anything admitted,

20  because I'm not going to be referring to anything other than

21  the arguments and the briefing.  So I'll leave it at that.

22           THE COURT:  Thank you.  All right.

23      Ms. Lewis, you may continue then.

24           MS. LEWIS:  Yes.  Thank you, Your Honor.  I

25  appreciate that.

1      With respect to the declaration of David Wallace.  We

2  are offering that just for the Trustee's opinions and beliefs

3  as to the facts that are outlined in there.  And his -- the

4  facts are not for legal conclusions.  But we would like to

5  also proffer that -- offer that as a proffer of testimony on

6  behalf of David Wallace.

7              THE COURT:  You should.

8              MS. LEWIS:  Okay.  Thank you, Your Honor.

9      Back to our -- docket number 450, our motion for

10  approval of the disclosure statement.  The disclosure

11  statement, as referenced, is under Tab 1 and was originally

12  filed under docket number 45.

13      We are proposing that the disclosure statement, of

14  course, be approved.  And we've outlined various procedures

15  for both the confirmation process and for getting the voting

16  and voting reports and voting procedures approved by the

17  Court.  I'm going to go through some of those.  As you will

18  note in the declaration of David Wallace, which is Exhibit

19  Trustee 6, we have some amendments to the dates proposed.

20  And I'm going to go through those as we proceed through the

21  motion.  Those amendments -- or the new proposed dates relate

22  to the fact that there has been some discussion between the

23  Trustee and CPIF Lending and other parties involved as to

24  confirmation related discovery.  Should the Court deny the

25  motion to convert and allow everything to proceed and approve

1  the disclosure statement, then we would be proceeding under

2  that discovery plan, which would extend the timeline

3  slightly.  So I'll be noting for the Court where the date and

4  the actual motion that was filed under 450 has changed.  And

5  I will give the proposed dates, as we go through.

6       First, the Trustee offers the disclosure statement to

7  the Court for approval, noting that we believe this provides

8  adequate information (indecipherable few words) vote on the

9  plan.  We believe that it's checked all of the boxes that are

10  necessary for letting the plaintiffs/creditors have the

11  information necessary to make an informed decision on their

12  vote.  We note that, and can address later, that CPIF has

13  objected to certain aspects of the disclosure as being

14  inadequate.  We believe that all of those are incorrect.  We

15  would say that it is adequate, or it's been addressed in the

16  additional exhibits offered to the plan, mainly the

17  liquidation analysis, which Exhibit Trustee 3, and the form

18  investor claim schedule, which is Exhibit Trustee 4.

19       The voting procedures are outlined for the Court.

20  Generally -- I'm happy to go through them specifically, Your

21  Honor.  But they are relatively run of the mill.  And so I'm

22  happy to go either way.  Would the Court prefer me to go

23  through those voting procedures?

24            THE COURT:  I've already read them.  Thank

25  you.

10

1          MS. LEWIS:  Okay.  Then I'll just hit -- go

2     through and hit the deadline procedures and explain some of

3     that.

4          So originally we had proposed a September 1st

5     confirmation hearing deadline -- hearing date and had checked

6     on the date availability.  At this point, we're requesting

7     for an early October confirmation hearing, but no earlier

8     than October 5th.  So on October 5th, or later, confirmation

9     hearing to allow for the confirmation related discovery to

10    take place, as I noted.

11         From that, we would ask that the voting deadline be --

12    that was originally referenced to be August 24th, that that

13    be, instead, September 1st, if I can.  That same deadline,

14    September 1st, we propose being the confirmation objection

15    deadline.  And we would ask that the Court allow us 14 days

16    after entry of an order approving the disclosure statement to

17    serve the solicitation packages.

18         One last deadline would be the voting record date.  We

19    originally had provided a July 13th voting record date.  But

20    we believe that there are some motions -- some claims that

21    (indecipherable word) objection to clean them up from the

22    need to provide ballots on very procedure bases, like the

23    fact that they've been amended, or are duplicates.  And we're

24    still in the process of that.  So we would ask that the

25    voting record date instead be set for this Friday, July 17th,

1  to allow those objections to be filed throughout this week.

2  And clear up some of the claims registry before the ballots

3  are prepared.  We believe that will be more cost effective

4  for the estate and would not provide any prejudice to any of

5  the parties involved.

6      And since Your Honor has reviewed the various

7  procedures, the voting procedures and the balloting

8  procedures, that is all we have with respect to the

9  solicitation procedures, though we're happy to answer any

10 questions you might have on any of those procedures.  And

11 then also as to the disclosure statement and any of the

12 exhibits attached thereto.  Particularly, if there is any

13 questions about the investor claims schedule, I'd be happy to

14 explain a little bit of that.  And maybe I'll just go ahead

15 and explain a little bit about that process.

16     I have in reviewing, particularly in (indecipherable

17 word) situations, like the ones we've dealt with in this

18 case, reviewed various ways of (indecipherable word) investor

19 claims that would be (indecipherable few words) the estate

20 and for creditors.  And if you look to the Trustee Exhibit

21 Number 4, this is a form of investor claims schedule.

22 There's a complete investor claims schedules would include

23 the claim numbers, the name of the claim holder, and the

24 original note amounts of the claims.  Now, I guess the -- I

25 believe that the structure of doing this would be more of a

1   plan confirmation issue.  BUt I do wanted to explain this

2   exhibit, to show what the final solicitation package exhibit

3   would look like.  Which would be the beginning part of it,

4   the bracket would be filled in.  And then the investors

5   claims schedule would have all of the information of the

6   investor claims that the Trustee would say, this is the

7   allowed amount of the claim on which the person -- the

8   individual, in most instances, would vote.  But also would

9   ultimately be allowed part of their claim, if they agreed

10  with that amount under the procedures outlined in the

11  disclosure statement and the plan.

12      As I mentioned, the Trustee believes that all of these

13  processes in the disclosure statement will provide adequate

14  information for voters to make informed decisions on the

15  plan.  But we are happy to add any details that the Court

16  direct.

17          THE COURT:  All right.  Do you have any

18  agreements to make any changes to the disclosure statement?

19          MS. LEWIS:  No, no.

20          THE COURT:  That's fine.  I'm just asking.

21      Okay.  So I would like to hear if there are any

22  objections to the disclosure statement, then.

23          MR. NYLEN:  Good afternoon, Your Honor.  Sven

24  Nylen on behalf of CPIF Lending.

25      As I mentioned, we had an objection on the basis that

1    the plan is patently unconfirmable.  The objection is --

2    rather involves -- I might first offer up, for anyone else if

3    they want to go ahead with me, if they have any objections in

4    terms of the adequacy of the information.

5            THE COURT:  Does anyone wish to be heard with

6    respect to the disclosure statement?

7        All right, you may proceed.

8            MR. NYLEN:  All right.  Thank you, Your Honor.

9        Before getting into the legal two I've raised, I first

10   want to appreciate the Trustee's counsel working with us on

11   the scheduling order, we had worked on to resolve our motion

12   for protective order.

13       I'll note in terms of the scheduling.  I think a

14   September 1st objection deadline could be a little early,

15   since depositions will be going on through September.  But

16   hopefully that's something that the Trustee and CPIF can talk

17   about off-line and maybe have an extension as to CPIF.

18   Because I can see us filing a very raw confirmation

19   objection, if this goes forward while discovery is still

20   underway.  I was really thinking of an objection deadline two

21   weeks prior to confirmation hearing.  But I don't want to

22   waste the Court's time with that conversation.  I think

23   that's something that hopefully the Trustee and CPIF can talk

24   about off-line.

25           THE COURT:  Okay.

14

1           MR. NYLEN:  With respect to the two matters

2    set today.  We have the disclosure statement, as well as

3    CPIF's motion to convert.  And although these are two matters

4    with separate legal standards, the bases for both the motion

5    to convert and the objection to the disclosure statement are

6    largely the same.

7           We believe that the proposed plan is patently

8    unconfirmable and that the estate and creditors will be

9    better served by avoiding the cost of a confirmation process

10   by an unconfirmable plan, and simply letting the distribution

11   rights under Chapter 7 control.

12          With respect to CPIF's objection to the disclosure

13   statement based on the patent unconfirmability of the

14   proposed plan, it's well accepted that Bankruptcy Court can

15   deny approval of a disclosure statement, when the proposed

16   plan is facially defective such that it cannot be confirmed.

17   And the purpose of such denials is to avoid unnecessary

18   expense and delay that would otherwise fall on creditors.

19          Now, in this case, there are two primary issues we've

20   raised with the proposed plan.  First, it seeks to place a

21   binding cap on CPIF's claim, which is not supported by the

22   Bankruptcy Code or case law.  Second, the proposed plan seeks

23   to substantively consolidate a dissolved entity with no

24   assets into the estate.  We believe both of those provisions

25   make the plan facially defective, such that going forward on

1    confirmation should not happen.

2         Starting with the proposed cap on future creditor

3    claims.  CPIF's claim was approximately $24.7 million, as of

4    the petition date.  Now, assuming collateral value exists to

5    support post-petition interest and fees, as may be allowable

6    under Section 506 of the Bankruptcy Code, we estimate that

7    the claim may be in excess of $30 million, as of today.  The

8    proposed plan, however, seeks to cap that amount at $15

9    million, using estimation under Section 502(c) of the

10   Bankruptcy Code.  There are two fundamental flaws with the

11   proposed cap on CPIF's claim.  Number one, Section 502(c) is

12   not applicable, because CPIF's claim is not contingent or

13   unliquidated.  And, number two, estimations cannot be given

14   res judicata affect.  That's because if a creditor eventually

15   prevails in a subsequent adversary proceeding, which CPIF is

16   subject to now, it is entitled to have that adjudication

17   control over the estimated amount of its claim, pursuant to

18   Section 502(j) of the Bankruptcy Code.

19        Now, turning to the applicability of Section 502(c) on

20   estimation.  We have direct guidance from the 5th Circuit

21   Court of Appeals.  In two cases the 5th Circuit has stated

22   that using 502(c) for claims that are not contingent or

23   unliquidated is, quote, simply inappropriate.  And those

24   cases are In re Ford at 967 F.2d 1047, and In re Continental

25   Airlines at 981 F.2d 1450.

16

1       So the dispositive issue here is whether CPIF's claims

2  are contingent or unliquidated.  Now, based on the briefing,

3  it does not appear that the Trustee is asserting that CPIF's

4  claim is unliquidated, which makes perfect sense.  CPIF's

5  claim is based on a lending relationship.  And the amount of

6  the claim is easily calculated by tracking disbursements and

7  funding and apply fee and interest provisions of the

8  underlying loan documents.  So the only potential basis for

9  estimating CPIF's claim, is the Trustee's assertion that the

10  claim is contingent.  And on that issue, the 5th Circuit

11  Court of Appeals has articulated the straightforward

12  definition of contingent claims in the Ford case.

13      And in that case a contingent claim is one that, quote,

14  The debtor will be called upon to pay only upon the

15  occurrence or happening of an extrinsic event which will

16  trigger the liability of the debtor to the alleged creditor,

17  and if such triggering event or occurrence was one reasonably

18  contemplated by the debtor and creditor at the time of the

19  event giving rise to the claim occurred, end quote.  Again,

20  that's the In re Ford case, 967 F.2d.  And that quote is at

21  1051.

22      And I want to focus the Court's attention on that last

23  phrase, in particular, which requires that the triggering

24  event must be one that was reasonably contemplated by the

25  parties at the time the underlying agreement was created.

1    Because the Trustee omitted that portion of the definition in

2    the Trustee's reply brief.  And it's an important phrase,

3    because absent that language, nearly every claim could be

4    considered contingent, because debtors could take the

5    position that liability never exists, until defenses and

6    counterclaims are litigated.  But the 5th Circuit rejected

7    that argument in the Ford case, stating that even though

8    debtors in that case had valid contribution defenses which

9    could have affected the amount of the claim of the creditor,

10   Section 502(c), along with other sections of the Bankruptcy

11   Code that rely on the word contingent, look to whether the

12   liability on the claim arose pre-petition or relied on a

13   potential extrinsic even to trigger liability.

14        Now, this is further illustrated in the All Media

15   Properties case, which is where the 5th Circuit definition of

16   contingent originates.  And that case is cited and relied

17   upon by the Ford decision.  And, again, that In re All Media

18   Properties at 5 B.R. 126.  And that's the Bankruptcy Court

19   for the Southern District of Texas, 1980, which was affirmed

20   per curiam by the 5th Circuit at 646 F.2 193.

21        Now, in the All Media Properties case, the Bankruptcy

22   Court was dealing with two involuntary petitions and trying

23   to determine whether the petitioning creditors held eligible

24   claims.  The question there was whether unmatured or disputed

25   claims were contingent for purposes of Section 303 of the

1   Bankruptcy Code, which at that time, in 1980, did not make a

2   creditor ineligible, if its claim was disputed.  The

3   Bankruptcy Court in the All Media case stated quite clearly

4   that, quote, Just because a claim is unliquidated, disputed,

5   or unmatured, apparently, does not mean it is contingent, end

6   quote.  And, again, this is the decision that the 5th Circuit

7   endorsed in the Ford case as setting the definition of

8   contingent.  And it states that there is a clear difference

9   between disputed claims and contingent claims.

10      This differentiation between contingent and disputed

11  gets further supported by the fact that Congress eventually

12  amended Section 303 on involuntary petitions to add that not

13  only are contingent claims ineligible to pursue involuntary

14  petitions, but so are claims that are subject to bona fide

15  disputes.  Likewise, in the definition of claim, under

16  Section 101, Congress wrote that a claim may be contingent or

17  disputed.  If every disputed claim was contingent, Congress

18  would not need to use both words in Sections 303 and 101.

19  And that's the exact analysis adopted by the 5th Circuit in

20  the Ford case.

21      Similarly, this binding 5th Circuit authority is

22  consistent with official forms of schedules of assets and

23  liabilities promulgated by the United States Courts.

24  Obviously that's not binding authority.  But it's consistent

25  with how the terms are generally viewed by bankruptcy

1  practitioners.  And if you actually look -- if you think

2  about schedules of claims, it has the C, U, and D for

3  contingent, unliquidated, and disputed.  They are three

4  different concepts.  Additionally, the instructions that

5  accompany those official forms actually say, a claim is

6  contingent, if you are not obligated to pay it, unless a

7  particular event occurs after you file for bankruptcy.  A

8  claim is disputed if you disagree about whether you owe a

9  debt.

10      So, you know, the binding precedent in this Circuit is

11  clear and consistent with the plain language of the

12  Bankruptcy Code.  And I think the Trustee's position is,

13  essentially, conflating the term "contingent" and the term

14  "disputed".  And at this point, I'd like to take a few

15  moments to quickly differentiate the cases cited by the

16  Trustee in his reply brief.  First noting, they are all

17  outside of the 5th Circuit.  And to the extent they give a

18  definition of contingent, they deviate from the definition

19  that's endorsed by the 5th Circuit.

20      I know this is an odd procedural posture to do this.

21  But since they were raised on a reply brief, I'm going to

22  walk through them now.  We're happy to file a surreply in

23  short order, if that would help the Court.  But, otherwise,

24  I'm just going to briefly walk through these cases.

25      The first case the Trustee cites is from the 9th

1  Circuit, Frock versus Frock.  That involved a divorce

2  proceeding where the debtor's ex-spouse had submitted a claim

3  related to his marital property divisions.  And the 9th

4  Circuit (indecipherable word) that because the claim relied

5  on, quote, events outside of the bankruptcy case, end quote,

6  namely the Family Court had not yet determined what, if any,

7  property was marital property subject to division, the claim

8  was contingent.  Until that determination was made by the

9  Family Court, according to the 9th Circuit, the claim

10 remained contingent.

11      Now, that definition does not align with the 5th

12 Circuit's definition.  However, using that definition, again,

13 we are talking about something outside of the bankruptcy

14 court.  Where here, the Trustee is pointing to, you know,

15 claims raised by the Trustee in this bankruptcy case.

16      The second case cited, also from the 9th Circuit, In re

17 Hockusolar (phonetic), relies on a similar distinction

18 between matters occurring inside the bankruptcy case which is

19 outside.  Now, the key in this case is that there were two

20 affiliated debtors in Chapter 7, each with a different

21 Chapter 7 Trustee.  And that's not entirely clear, when

22 you're reading the Trustee's reply brief.  Now, again -- so

23 there you have two separate bankruptcies, so you could see

24 how one -- the effect of what happens in one, might relate to

25 the other.  Again, relating back to events outside of the

21

1  bankruptcy.

2       And, finally, two other cases I'll just note briefly.

3  The In re Lusheshi (phonetic) and the In re POC Props case.

4  There's no real legal analysis of the term contingent in

5  those cases.  In particular, the POC Props case merely seems

6  to rely on the Lusheshi to support its use of 502(c).  And in

7  the Lusheshi case, the creditor was the one seeking

8  estimation of its own claim, based on a construction loan.

9  And based on the pleadings in that case, it appears that the

10  creditor even acknowledges that its claim may not necessarily

11  be contingent.  So I'm not sure there's really any analysis

12  in those cases, other than the ultimate results that support

13  any deviation from what we have here, which is binding 5th

14  Circuit precedent setting forth a definition of contingent.

15  And CPIF's claim simply does not fit into that definition.

16  And that conclusion does not change, simply because the

17  Trustee has filed an adversary proceeding against CPIF or

18  otherwise disputes CPIF's claim.

19       That really should end the analysis right there.  Since

20  CPIF's claim cannot be estimated under Section 502(c) of the

21  Bankruptcy Code, the proposed plan is patently unconfirmable,

22  because its treatment of CPIF's claim and the reliance on

23  this estimated cap for purposes of making distributions to

24  creditors is not -- is in violation of the Code.  The

25  Trustee's argument that the proposed plan remains

1  confirmable, because it leaves the amount of the cap

2  estimated as to be determined by the Court, doesn't change

3  that conclusion.

4      Now, the Trust relies on U.S. Brass Corp., for this

5  proposition.  Now, in that case, the issue was impermissible

6  third-party releases.  And the Court had already declined to

7  approve the first attempt at a disclosure statement, based on

8  the inclusion of impermissible releases.  And what the debtor

9  did on its second attempt as a workaround was propose a plan

10  where the third-party releases injunctions would only be

11  effective in the plan, if the Court approved a related

12  settlement.  If the Court denied approval of the settlement,

13  which denial could be based on the Court finding the releases

14  were inappropriate, then the releases would be removed from

15  the plan.  So the plan preserved the controversial

16  provisions, but eliminated them entirely, if the Court found

17  they exceeded the bounds of the Bankruptcy Code.  Plan

18  confirmation couldn't move forward, because the plan would

19  automatically remove the offending sections, if the Court

20  found it impermissible.

21      Here in this case, it's not an issue of the level of

22  the cap, but the concept of the cap entirely.  CPIF's claim

23  is not subject to estimation under Section 502(c).  Thus,

24  allowing the Court to set the amount of estimation, doesn't

25  remove the objectionable flaw presented by the plan.  Only

23

1    removing estimation of CPIF's claim under 502(c) would fix

2    the issue with the plan.  And if you do that, your left with

3    the same distribution scheme as you see in a Chapter 7.  Now,

4    even assuming, for the sake of argument, that CPIF's claim

5    was subject to estimation under 502(c), the cap could not be

6    binding.  In fact, several of those cases cited by the

7    Trustee, including the POC Props and (indecipherable word),

8    note that the estimation must be non-binding, because of

9    Section 502(j) of the Bankruptcy Code.

10       Now, as we pointed out in our briefing, the plan seeks

11   to make the estimation under 502(c) binding on CPIF, but not

12   the Trustee.  CPIF can never have a claim above the estimated

13   amount.  But the Trustee is not bound at all by the

14   estimation process, when it comes to litigation in the

15   pending adversary proceeding.  And that asymmetry simply

16   cannot be the correct answer.

17       The Encorp case that we cite in our briefs, which is at

18   137 B.R. 219 out of the Bankruptcy Court for the Southern

19   District of Texas, sets out a fairly clear analysis of why

20   this binding cap here in this case is inappropriate, and how

21   estimation is supposed to work.  In order to expedite cases,

22   contingent and unliquidated claims may be estimated and

23   debtors may make distributions based on that estimation.  But

24   that estimation does not finally adjudicate the claim.

25       If CPIF were to be fully vindicated in the pending

1    adversary proceeding, that decision should control over the

2    estimation process, as it would trigger reconsideration under

3    Section 502(j).  Even the Mirant case, cited by the Trustee,

4    recognizes that any binding nature of claim estimation is,

5    quote, subject to reconsideration under the standards of

6    Section 502(j) of the Bankruptcy Code, end quote.

7         Now, the Trustee's reply brief, however, suggests that

8    the Mirant Court rejected the reasoning of Encorp.  But, in

9    fact, the Mirant Court doesn't discuss Encorp at all.

10   Rather, the fact that it recognizes reconsideration under

11   502(j) tends to suggest that it is aligned with Encorp.  So

12   none of the cases cited by the Trustee really stand for the

13   proposition that estimation can finally resolve a party's

14   rights.  And the clear language of Section 502(j) makes it

15   clear that creditors are entitled to full adjudication of

16   their claims.

17        And logically that makes sense, because CPIF should not

18   be in a position where the estimations process, which isn't

19   governed by the same formal rules of evidence and typical

20   discovery rules and procedural protections of an adversary

21   proceeding, that that estimation process is the means of

22   finally determining the claim.  And this is particularly true

23   that that shouldn't be the case, where the Trustee is not

24   bound at all by the estimation process.  CPIF has only

25   downsized, while the Trustee gets two bites at the apple.

1          Now, I do acknowledge that the Trustee correctly

2     asserts that many Courts permit the estimation process to

3     determine allowability for purposes of distribution.  But

4     permitting distributions based on estimates is not the same

5     thing as a binding cap.  Instead, most Courts recognize that

6     distributions on contingent claims may be based on a 502(c)

7     estimation, but are subject to reconsideration made prior --

8     prior consideration requests prior to those distributions.

9     And I recognize that as the practical matter that CPIF would

10    face, if this plan moves forward.  Because the practical

11    problem would be for CPIF under the proposed plan that CPIF

12    could be in a position where if its claim is estimated, even

13    if CPIF is fully vindicated in the adversary proceeding,

14    distributions may have gone out and CPIF will be left to try

15    to disgorge those distributions from wherever they are.  So

16    when we talk about these cases where you can have allowance

17    for distributions, that doesn't eviscerate 502(j), it creates

18    a practical problem for the creditor that may have been

19    estimated who is later vindicated.

20         Now, before I turn from the issue of the impermissible

21    estimation cap.  The Trustee in the reply brief argues that

22    there are material facts in dispute regarding the potential

23    equitable subordination of CPIF's claim.  And, therefore, the

24    Court should not sustain this disclosure statement objection.

25    And we don't deny that there are facts in dispute as to the

1    merits of equitable subordination.  But here in this

2    procedural context of approval of the disclosure statement,

3    our objection is focused on whether a Chapter 11 plan may

4    estimate a non-contingent claim under 502(c).  And, if so,

5    whether that estimation can be binding, notwithstanding

6    future adjudication of the claim and CPIF's right to

7    reconsideration under 502(j).  Both of those issues are pure

8    legal questions with no material facts in doubt.  The

9    question is simply whether CPIF's claim is contingent under

10   the 5th Circuit's definition.  It is not so the plan is

11   patently unconfirmable.

12       Now, turning to CPIF's second issue with respect to the

13   plan, which is the non-debtor substantive consolidation

14   issue.  We believe the plan's consolidation of Texas Cash Cow

15   renders the plan unconfirmable.  The 5th Circuit has not set

16   forth clear standards for substantive consolidation.  But two

17   key -- two key standards tend to arise in each case, dealing

18   with substantive consolidation.  First, the Court must look

19   to whether parties relied on the separateness of the

20   potentially consolidated entities.  And, second, Courts look

21   to whether creditors will be harmed by the consolidation.

22   Without a doubt, substantively consolidating an entity with

23   liabilities but no assets will hurt existing creditors.

24       At a minimum, the proposed plan should not be able to

25   deem Texas Cash Cow consolidated, if the Court finds such

1  consolidation impermissible, which is what Section 4.1 of the

2  plan proposes now.  And that section reads, To the extent

3  that substantive consolidation is not appropriate, given

4  Texas Cash Cow status as a terminated entity, Texas Cash Cow

5  will be deemed to be consolidated with CFO Management and

6  part of the debtor for all plan purposes.  We do not believe

7  that the plan can be -- allow that's just deemed to have

8  happened, if Your Honor finds consolidation inappropriate.

9  At a minimum, we think that language would need to be

10  changed.

11      That ends my presentation of the objections to the

12  disclosure statement.  Turning to the motion to convert,

13  which I will be brief about, Your Honor.

14      As we explained in our brief, cause for conversion is

15  established under 1112(b), if there's an ongoing or

16  substantial loss to the estate.  Here, the estate has ongoing

17  losses, because there's no business generating any revenues

18  and liabilities continue to be incurred.  Now, the one issue

19  of debate between CPIF and the Trustee, I think, is really

20  the issue of whether the occurrence of ongoing liabilities

21  versus paying them is diminution that constitutes cause under

22  1112(b).

23      I would like to quickly discuss a Gabriel line of cases

24  suggesting that incurrence of liabilities does not establish

25  diminution of the estate under 1112(b).  And as we explained

1   in our briefs, I think both in our motion to convert, as well

2   as our reply in support, the Gabriel Court looked to the

3   economic reality of the case to determine whether there were

4   ongoing losses.  Now in that case, because the estate had no

5   assets, other than causes of action that were being

6   litigated, it determined that there was no loss to the estate

7   by having professionals pursue those causes of action.

8   Functionally, an estate with zero assets cannot get worse for

9   creditors.  Likewise, the GPA Technical Consultants Court

10  looked at the economic realities of the estate to determine

11  that any losses the estate was suffering, or coming directly

12  from the secured creditor's collateral, the secured creditor

13  in that case had consented to having those losses charged

14  against their collateral.  Therefore, functionally, the

15  estate was left in the same position.

16      Here, that's just not the situation.  Administrative

17  claims are coming directly out of the pockets of creditors.

18  And there's simply no justification to argue that the expense

19  of the plan confirmation process will affect distributions.

20  There is ongoing loss.  And, therefore, there is cause to

21  convert here.

22      Now, we are not arguing that you can never have a

23  liquidating Chapter 11 case.  A creditor first has to raise

24  the issue of conversion.  Many times creditors are happy to

25  see a liquidating plan move forward.  Other times, the Court

1  may determine that compelling circumstances justify keeping

2  their case in Chapter 11.  As we noted in our reply brief,

3  many Courts have found that once cause is established under a

4  continuing loss theory, Courts have to convert.  But those

5  decisions are binding on Your Honor.  But given that the

6  proposed plan, as we've just laid out, is patently

7  unconfirmable, CPIF does not believe there is any benefit to

8  stay in a Chapter 11.  And by doing so, if we go through this

9  process and we have an unconfirmable plan, as we've laid out,

10  we're going to be back at square one.

11      That ends my presentation, Your Honor.  And I'm happy

12  to take any questions or cede the virtual podium.

13              THE COURT:  Thank you.

14      All right.  Does anyone else wish to be heard before I

15  turn back to the Trustee?

16              MR. LEVICK:  Yes, Your Honor.  This is Larry

17  Levick.  I'd like to be heard on both motions, if I may.

18              THE COURT:  You may.

19              MR. LEVICK:  Thank you.  Thank you, Your

20  Honor.

21      I know I -- I think I have the entire Committee on the

22  line.  And there were many other creditors that called to

23  also get the call-in information.  These creditors have been

24  very active.  And I guess you could say we've kind of

25  assisted in holding their hands, a little bit, during this

1  process.  It's been a little overwhelming for this group of

2  elderly investors who got swindled originally by Mr. Carter,

3  who was the principal of CFO.

4       But before I get to, exactly -- to rebut exactly what

5  Mr. Nylen has said, let me say this.  Judge, throughout this

6  case when we've had various issues being raised, you've asked

7  me what the Committee's position has been and you have

8  used -- phrased this many times saying, it is your ox being

9  gored.  So what do you want to do, Mr. Levick?

10      Well, we had a Committee meeting about this and the

11 Committee is resolutely behind the Trustee on this.  And we

12 are steadfastly opposed to the motion to convert.  And I want

13 to tell the Court why.

14      First of all, we have -- we're in the final phase of

15 liquidating these assets.  We have a Chapter 11 Trustee in

16 place, David Wallace, who has an extensive real estate

17 background and has been invaluable in helping us liquidate

18 these assets.  We have kind of the crown jewel that is being

19 marketed now called Crescent Park that Mr. Wallace is very

20 close to having a contract to close this deal.  And we are

21 concerned that if we convert to a Chapter 7 at this time, it

22 could reduce the value of that asset.  We believe that assets

23 sell better in an 11 than they do in a 7.  And we want to

24 keep relying on Mr. Wallace's expertise as we move towards

25 the goal line with liquidating Crescent Park.

1          The second reason we want to stay in the 11 is we also

2     like the lawsuit that was filed against CPIF.  Ms. Ross --

3     the Trustee through Ms. Ross' firm has filed a complaint to

4     equitably subordinate the CPIF claim to avoid their liens as

5     fraudulent transfers.  And she has laid out a road map for

6     the Court to follow, that we believe the Court should follow

7     and exercise those remedies.  We have confidence in this

8     team.  And the fact that this lawsuit has been filed and is

9     being aggressively pursued sort of highlights what the real

10    motive of CPIF is in filing these pleadings.  CPIF was fine

11    with how the case was going, until they were getting sued and

12    until they were being asked to turn over their documents and

13    produce their witnesses.  Their motive couldn't be more

14    transparent, Your Honor.

15         The third reason that I believe the case needs to stay

16    in an 11 is these investors have been through a lot.  They

17    were originally under the Phillip Carter regime, the man who

18    kind of masterminded this whole ponzi scheme.  After that,

19    they had the SierraConstellation CRO regime.  And we know how

20    that worked out at a very long hearing we had last year when

21    CPIF, the Committee, the SEC, and the U.S. Trustee moved to

22    remove Sierra from running this case, due to numerous

23    conflicts of interest.  And if the creditors had to go

24    through another regime, which would be their fourth regime,

25    if this converts to a Chapter 7, I believe that that would

1    overwhelm them.  We are holding hands with the -- we were

2    having to hold some hands with the creditors now -- I mean,

3    these investors.  But if that happens, we're going to have to

4    engage in some intensive care.  And that is (indecipherable

5    word) to them when we are so close now to confirming the

6    liquidating plan.

7         So let me address the specific arguments that Mr. Nylen

8    made about the claims estimation process.  I believe his

9    reading is way too narrow.  The history is as follows.  CPIF

10   has the liens on only two assets, Your Honor.  One is called

11   the Frisco Way and the second is called the Crescent Park.

12   With Frisco Way, we sold all of the different sections of

13   Frisco Way.  And pursuant to Court order, all of those funds

14   are being held pending further order of the Court, because

15   that is their collateral.  Mr. Wallace, we believe, is about

16   to sell Crescent Park.  And I believe upon that sale, he's

17   going to be holding enough money that will cover whatever the

18   CPIF claim is.

19        But we don't know the CPIF claim.  That has been one of

20   the problems in this case.  From the beginning, we have

21   requested and demanded an accounting from CPIF.  This is the

22   first case in my career a secured creditor fails to provide

23   an accounting.  It's been promised to us many, many times.

24   We had a conference here where they said, oh, we'll have it

25   to you -- we can have it to you in a few minutes today.  But,

1   you know what, we've never seen it and we suspect why.  That
2   it's going to cause all sorts of issues for them.  So we have
3   a secured creditor that won't provide us with the accounting
4   that Mr. Nylen talked about in his presentation.  Mr. Nylen
5   says, how do you set a secured creditor's -- how would you
6   know how much to allot to a secured creditor?  Well, you
7   would just get their accounting.  You'd see what the loan
8   documents say, what they've received, how they accounted for
9   it, and you would have a balance.  Well, that's something
10  CPIF has failed and refuses to supply to the Trustee and to
11  the Committee.
12       So Ms. Ross is left with a situation where they only
13  have two buckets of collateral.  She wants to start making
14  distributions for all of the uncovered millions that we have
15  for the investors, once the plan is confirmed.  So how does
16  Ms. Ross do that?  How does she bring them to the table?
17  Well, she sues them and she proposes a cap that the Court can
18  set at its discretion in the disclosure statement.  But
19  Mr. Nylen's reading is very narrow.  It says the amount to be
20  held in reserve can be no less than this cap, or any amount
21  that the Court sets.  So if Mr. Nylen wants to present his
22  accounting to the Court and the Court wants to consider it
23  and considers CPIF's status as a secured creditor, then we
24  can make such an allotment and the Court can set such a
25  reserve.  And at least we'll know how much money to set aside

1  for them.  But they have refused to tell us so far.

2        So I think what Mr. Nylen is doing is a little form

3  over substance.  He's focusing on the word estimation,

4  instead of the word reserve where Ms. Ross puts in her

5  disclosure statement many places that the Court can set the

6  amount.  And we can totally, if the Court thinks so,

7  adequately protect CPIF where they're not hurt, and we can

8  remain in a Chapter 11, and we can confirm a liquidating

9  plan.

10       Let me see if I had anything else that I wanted to

11  point out, Your Honor.

12        I think we need to focus on the form -- I mean, the

13  substance of Ms. Ross' plan, the Trustee's plan, not the

14  hyper-technical form.  And we can get where everyone needs to

15  be.  And if the Court thinks that -- agrees with Mr. Nylen

16  and we need to totally account for the claim, then Mr. Nylen

17  can furnish the appropriate accounting and we can determine

18  what that amount is.  And upon the sale of Crescent, add it

19  to the Frisco Way fund and they can be, quote, adequately

20  protected or taken care of.  And we can go forward and we can

21  confirm this plan.  And Ms. Ross can continue the litigation

22  that we believe the Chapter 11 Trustee needs to pursue,

23  rather than have a Chapter 7 Trustee have to get up to speed

24  again and further delay all of these creditors.

25       Thank you, Your Honor.  If you have any questions, I'd

1  be happy to take them.

2          THE COURT:  Thank you.

3          MR. MILLER:  Your Honor, David Miller

4  representing the plaintiff class in the adversary proceeding.

5  I don't want to just pile on to what Mr. Levick has had to

6  say.

7      But on behalf of that plaintiff/investor class, we

8  concur with what Mr. Levick has had to say, likely what

9  Ms. Ross is going to have to say.  We believe that a

10 conversion to a Chapter 7 harms everyone, other than CPIF.

11 And we look forward to finally getting CPIF to comply with

12 some discovery, as we move forward.  And we look forward to

13 getting in front of the Court under a Chapter 11 proceeding,

14 the likes of the parties, as opposed to the liquidation that

15 we think CPIF wants.

16         THE COURT:  Okay.  Thank you.

17     Does anyone else wish to be heard with respect to this

18 matter, before we turn to the Trustee?

19     All right.

20         MR. NYLEN:  Your Honor, Sven Nylen.  I do not

21 need to speak before the Trustee, but I would like to at

22 least to respond to some of those after the -- some of those

23 things just said after the Trustee has his presentation.

24         THE COURT:  Thank you.

25         MS. ROSS:  Your Honor, this is Ms. Ross.  Are

1  you ready for me to proceed?

2          THE COURT:  You may.

3          MS. ROSS:  Okay.  Thank you, Your Honor.

4      Your Honor, I want to talk to the Court about a couple

5  of things today.  The first thing is the statute that is at

6  issue in this case for the request for conversion.  And then

7  the second thing I want to focus on is the timing in this

8  case.

9      And with respect to the first point, I want to focus the

10  Court on what is missing from CPIF's arguments about why this

11  case should be converted.  And then with respect to the

12  timing of the case, Your Honor, I would like to point out the

13  following and that is this.

14      Every bankruptcy case has a point at which it needs to

15  get a plan confirmed.  And that time is now.  The time is now

16  in this case.  This is not a case where we have litigated

17  with everybody on earth.  It is not a case where we have

18  spent so much money fighting, that there's going to be little

19  left for creditors.  On the contrary, we have worked -- the

20  Trustee has been very cognizant of the needs of the retirees

21  in this case.  And has -- therefore, makes every effort we

22  can before we litigate matters to settle them.  And so the

23  time in this case now is for us to try to proceed on plan.

24  And if we fail, we fail.  But it will have only been one big

25  fight, which is very different from the kind of things

1   suggested by opposing counsel.

2        Your Honor, 1112(b) says the Court must convert the

3   case, if cause is shown.  I want to talk to you about what

4   has not been shown today.  There is no evidence of gross

5   mismanagement by my Trustee.  There is no evidence of failure

6   to maintain appropriate insurance.  These are the elements

7   set forth in 1112(b)(4).  There's no failure to comply with

8   the orders of this Court.  No failure to comply with the

9   reporting requirements.  No one has alleged that the Trustee

10   has failed to attend 341 Meetings.  The list goes on and on.

11   This case is about one thing only, and that is that CPIf is

12   not happy, unfortunately, that a case has been brought

13   against them.

14        Now, Your Honor, I'm not going to dispute that the --

15   that they have proving continuing loss to or (indecipherable

16   word) of the estate, because you can't have a liquidating

17   case without the assets going down in value every month

18   because of administrative claims.  But I'd like to come back

19   to that issue in a minute, because I don't think that the

20   other side has proven the elements necessary to prove

21   1121(4)(a), which is the one that they are relying upon

22   today.  I'll come back to that in a moment.

23        Let's talk for a minute about timing, other than the

24   timing that I have just addressed, which is the question of

25   whether or not this is the time for this case to be -- to

1  proceed.

2      Your Honor, this particular case, we had a meeting -- I

3  think everybody has referred to the meeting that occurred in

4  December of 2019.  And that meeting that occurred in December

5  of 2019 was a good-faith effort on behalf of everyone,

6  including CPIF in that comment.  They acted in good faith, as

7  did we.  But the fact of the matter is is that the timing of

8  what happened afterwards is telling.  The parties met in

9  December of 2019.  And on June 5th, my client instituted a

10  lawsuit against CPIF.  Let's talk about what happened during

11  the 120 days before that happened.

12      CPIF did not file a motion to convert in January of

13  2020.  They didn't file it in February of 2020.  They didn't

14  file it in March of 2020.  And they didn't file it in April

15  of 2020.  It was filed 120 days (indecipherable word).  And

16  if they were seriously concerned about diminution of this

17  estate, you would think we would have heard about it before

18  the date that they did start raising the issue, which was

19  June 5th.  So we would suggest that the Court draw whatever

20  conclusions that Courts draw about the timing.  But we think

21  the timing is telling.  And I ask that the Court consider the

22  timing in making its decision today.

23      Before I get to the plan confirmation issues, I'd like

24  to address a couple of things.  And, Your Honor, I'm going to

25  dispense with a lot of what I planned to discuss, because

1   Mr. Nylen kept his comments limited to fairly simple -- a

2   fairly specific area.  So let me go, I think, to kind of the

3   core of what I would like to point out here.

4        First of all, they've presented no case to me that --

5   and no case to this Court that suggests that the presence of

6   one of the elements of cause is sufficient to convert the

7   whole case.  In other words, I saw no case that said, well,

8   if you only had one of them, you can still convert the case.

9   They do cite the Loop case, but that case is an 8th Circuit

10  case decided under an earlier version of the statute.  And,

11  candidly, in that particular case, you actually had slightly

12  different facts.  In that case you had a debtor that was

13  trying to -- that had made the decision to start liquidating

14  its plan.  They had had multiple fights over plan

15  confirmation.  Something that's not present here in this

16  case.  And the 8th Circuit said, well, we find that it is not

17  reversible error, it was not improper for the judge to

18  conclude that -- and the Court did not abuse its discretion

19  in concluding that there was continuing loss to the estate.

20  Therefore, we're going to confirm it.

21       Well, Your Honor, that's not a ruling that says that

22  only continuing loss of the estate is sufficient to convert

23  the case.  That is just a ruling that the Court in that

24  particular case, who seemed to rely upon those issues the

25  most, was it's permissible.  Once you look at the case and

1   realize that there were other issues going on in that case to

2   cause that judge to convert the case.

3        Then I'd like to talk to you about the language of the

4   statute.  Again, starting with 1112, which is where we need

5   to begin and where we need to end.  If you look at 1112(a),

6   they have to show cause.  The only element that they've shown

7   anything close to cause about is contained in 1114(b) --

8   excuse me, 1112(b)(4)(A), substantial or continuing loss to

9   the diminution of the estate and the absence of reasonable

10  likelihood of rehabilitation.  Okay.  That last sentence

11  there, reasonable likelihood of rehabilitation.

12       Your Honor, I'm not arguing that the plan that we're

13  going to propose is an attempt of rehabilitation.  That's not

14  correct.  But then they must prove that there's no reasonable

15  likelihood that we can rehabilitate.  They've not presented

16  evidence on that.  And beyond that, Your Honor, I'd like to

17  point to a case called In re Modern Video, which we will

18  provide to both sides.  I don't know whether we had it in our

19  papers or not.  But it's 2019 Bankruptcy Lexis 3317.  And

20  that particular case, a Bankruptcy Court was faced with

21  exactly the situation we're talking about here.  What the

22  Court there said was, I rule that rehabilitation can

23  encompass a Chapter 11 liquidating plan, at least in those

24  situations where the Bankruptcy Court, exercising its

25  discretion, determines that a Chapter 11 liquidation makes

1   more sense than a Chapter 7 liquidation.  That is exactly

2   what we have here.  The judge in that case held that because

3   he thought, in that particular instance, it was better for

4   creditors to stay in an 11.  That he did not believe the

5   creditor had demonstrated all of the elements necessary in

6   order to establish cause.  The Court also pointed out, and I

7   think it's a very compelling point, the Court said, look, if

8   the plaintiff, in this case our plaintiff would be CPIF -- if

9   CPIF's view of the law is correct, the consequence would be

10  that any single unhappy creditor in a Chapter 11 case could

11  stall all efforts to confirm a Liquidation Chapter 11 plan

12  and force conversion to Chapter 7 in a situation the Chapter

13  11 debtor was incurring continuing loss of diminution to the

14  estate.  In other words, money-losing debtors could not

15  remain in Chapter 11 long enough to confirm a liquidating

16  plan over the objection of even a single creditor, even

17  though hypothetically, everyone else in the case firmly

18  believed it made far more sense to have the debtor in charge

19  of the liquidation than in a Chapter 7.  And in that case the

20  Court said, I'm not converting the case.  We would ask that

21  the Court not convert the case here.

22        Your Honor, I'd like to turn, if I can, very briefly to

23  the last few points.

24             THE COURT:  You may.

25             MS. ROSS:  One second.  I'm sorry.  I need to

1  take a sip of something here for a minute.

2       I'm not going to spend a lot of time on these issues,

3  because I do think that Judge Sharp's opinion, which is cited

4  in our case -- in our case in the U.S. Brass case, addresses

5  the issue.

6       The fact that there are issues in a proposed plan does

7  not mean that this Court has to refuse to go forward.  And if

8  they're going to talk about -- you know, I do want to talk

9  about statutory provisions.  The other side has focused only

10 on the position that they're saying that we're estimating

11 their claim.  We may well be doing that.  I think we did say

12 we might do that.  But, Your Honor, let's put estimation

13 aside.  They haven't cited a single case that prevents us

14 from equitably subordinating them in a plan.  They said every

15 day, it says, all the time, and it is permissible.  And

16 whether or not I can go ahead and get their claim estimated,

17 I most certainly can get a ruling from this Court on how much

18 they should be equitably subordinated, at a minimum.

19      With respect to the other arguments that they focused

20 on, I would note that the main argument they were making --

21 hang on one minute.  Mr. Levick -- I'll try not to repeat

22 what Mr. Levick said, because he made some of the points that

23 I was going to make.  I appreciate that.  One minute.

24      The reason, Your Honor, that we are seeking to do what

25 we are doing in this plan is because when the day is done,

1   the largest claim against this estate is the CPIF claim.

2   That's been the case from the beginning.  We've known about

3   it from the beginning.  The Texas Cash Cow issues, I don't

4   know how that can be -- they confer that it's -- that it's

5   not confirmable out of the box, because we will have evidence

6   on those issues.  But I do want to make it clear, Your Honor,

7   that from the beginning of this case, we've had an estimate

8   of about 35 to $40 million in claims of the investors.  And

9   among those parties that we've assumed were going to have

10  claims, were the Texas Cash Cow investors.  Because the Texas

11  Cash Cow investors, like many of the other investors, were

12  (indecipherable word) to giving money to these people.  And

13  then they, in turn, funneled the money to these entities that

14  were operating property.

15       Finally, Your Honor, the last point.  Oh, 502(j), Your

16  Honor, I don't know why that has any relevance in a case

17  where I'm seeking to equitably subordinate the claim of the

18  opposing counsel.  That only talks about allowance claims.

19  It doesn't talk about equitable subordination.

20       And then finally, Your Honor, the last issue.  Your

21  Honor, I think I've said what I need to say.  I have nothing

22  further to add.  And would ask that this Court proceed.

23  Nothing will get a plan confirmed faster than parties

24  litigating on a level playing field with one another.  And I

25  respectfully request that we be permitted to proceed with

1  that.  And that we be permitted to see whether or not we can

2  get a plan confirmed within the next 30 to 40 days.

3       Thank you, Your Honor.

4            THE COURT:  Thank you.

5       Okay.  Before the Court are two motions.  One is to

6  approve the disclosure statement --

7            MR. NYLEN:  Your Honor, I'm sorry to interrupt

8  you.  This is Sven Nylen on behalf of CPIF.  Could I respond

9  briefly to some of the assertions that were made in the

10  responses just now?

11            THE COURT:  Very briefly.  We're running

12  about -- we're running quite late.

13            MR. NYLEN:  Yes, Your Honor.  I will be very

14  brief.

15       First, as we said in our papers, we would have no

16  issue, if the unsecured creditors voted back in the same

17  Trustee and the same professionals were retained.  It has

18  nothing to do with derailing that.  We're still going to have

19  to deal with the adversary proceeding.

20       Number two, the hyper-technical form that I'm being

21  accused of embracing is the Bankruptcy Code.  So I don't

22  think that we can characterize it as hyper-technical form

23  over substance here.

24        Additionally, there's a lot of facts that were just

25  asserted that were not in the record, or not in evidence,

 1  that are irrelevant to the issues that we have raised.  We

 2  have tried to keep this a very much factual -- excuse me, a

 3  legal argument today.  But I think arguing about facts not in

 4  evidence, or a case that is not cited in papers, at the

 5  hearing is a little -- it puts us in a bad position, Your

 6  Honor.  And I think it's unfortunate.

 7      The last thing I'll mention, or two things I'd like to

 8  mention is, the plan doesn't say it's equitably subordinating

 9  us.  It says it's estimating us, CPIF.  So that is a

10  different plan that Ms. Ross is referring to that they would

11  have to file that we haven't seen, if she's changing the

12  position on what the treatment is.

13      And, lastly, as to the accounting issue.  I am looking

14  at emails right now where documents were provided to the

15  Trustee's office in November of last year.  And also a

16  calculation of our claim provided to the Trustee's office

17  earlier this year.  And the assertion that we are hiding the

18  ball is belied by the fact that there's never been a 2004

19  filed against us.  And the Trustee's adversary proceeding

20  doesn't attack the validity of our claim or calculations.

21  Rather, it's all fraudulent transfer and equitable

22  subordination.  And I will leave it at that.

23      Thank you, Your Honor.

24          THE COURT:  Thank you.

25      All right.  Again, there's a motion for approval of the

46

1  disclosure statement.  And then we also have a motion to

2  convert.  Because we're running about an hour late and we

3  have hearings right behind you, I'm going to be very brief.

4       The Court is going to approve the disclosure statement.

5  In approving the disclosure as containing adequate

6  information, the Court is not pre-judging the issue of the

7  confirmability of the plan.  There may be issues related to

8  an absolute limit on -- by use of the estimation procedures.

9  The Court is certainly cognizant of the arguments.  But I'm

10 not pre-judging that issue.  But the Court is noting that in

11 many, many Chapter 11 cases, the plan is negotiated, is

12 modified right up to and including confirmation.  And

13 certainly some of the proposed -- or suggested modifications,

14 including but not limited to equitable subordination of a

15 claim, are the kinds of plans that can be confirmed.  So the

16 Court is not making a judgment that this plan, as currently

17 proposed, may have some problems with it.

18      Having said that, there's time for the parties to

19 negotiate and alter it, and/or assert other claims.  So the

20 Court is going to approve the disclosure statement and

21 approve the deadlines as discussed on the record today.

22      If the parties negotiate a different deadline, you can

23 include it in the form of order, if it's agreed to by the

24 parties.  Otherwise, the deadlines that were mentioned are

25 fine and should be in the form of order approving the

 1  disclosure statement setting the procedures to get to

 2  confirmation.

 3      The confirmation hearing, let me see here.  I think

 4  we're looking at confirmation October 20th at 3:00.  Hold on

 5  just one moment.  I'm checking some dates.  Okay.  So October

 6  20th at 3 p.m. is confirmation.

 7          MS. ROSS:  Your Honor, what about on the

 8  motion to convert?

 9          THE COURT:  Okay.  I'm getting ready to.

10          MS. ROSS:  I'm sorry, Your Honor.

11          THE COURT:  Okay.  On the motion to convert,

12  the Court finds that the motion to convert should be denied

13  and cause does not exist.  The issues in this case are

14  certainly significant, are significant litigation to be had.

15  And there's been some progress towards liquidating the

16  assets.  And there needs to be further progress to get to a

17  distribution to the creditors.  But I don't see that there's

18  any particular benefit to converting at this point in time,

19  particularly when so many of the creditor constituencies are

20  in -- are opposed to conversion and this case is moving

21  towards plan confirmation.  So the Court is going to deny the

22  motion to convert.

23      I'm going to ask the parties to submit an order to the

24  Court consistent with the Court's ruling.  That order --

25  those orders are due within seven calendar days.  I'm going

1  to say let's make Ms. Lewis, I mean Ms. Ross responsible for

2  uploading that.  Make sure everybody has a chance to review

3  it before it gets uploaded.  Okay?

4        All right.  Anything further for purposes of today?

5                  MS. ROSS:  Thank you.

6                  THE COURT:  Thank you.  Parties are excused.

7                     (End of Proceedings.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                 C E R T I F I C A T E

2            I, CINDY SUMNER, do hereby certify that the

3     foregoing constitutes a full, true, and complete

4     transcription of the proceedings as heretofore set forth in

5     the above-captioned and numbered cause in typewriting before

6     me.

7

8

9

10

11

12

13

14                                    /s/Cindy Sumner

15                         _____

16                           CINDY SUMNER, CSR #5832
                             Expires 10-31-2022
17                           Cindy Sumner, CSR
                             5001 Vineyard Lane
18                           McKinney, Texas 75070
                             214 802-7196
19

20

21

22

23

24

25